TRANSCONTINENTAL REFRIGERATION COMPANY, Plain-
tiff and Appellant, *v.* EVERETT FIGGINS D/B/A BIG SKY
MARKET, Defendant and Respondent.

No. 13962.
Submitted Sept. 21, 1978.
Decided Nov. 1, 1978.
585 P.2d 1301.

Heath & Kirwan, Peter W. Kirwan (argued), Bozeman, for plaintiff and appellant.

Allen L. McAlear (argued), Bozeman, for defendant and respondent.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

Plaintiff Transcontinental Refrigerator Company appeals from a judgment rendered by the District Court, Gallatin County, sitting

without a jury, denying its prayer for total accelerated rent allegedly due for breach of a lease agreement, and finding a favor of defendant Figgins on his counterclaim for rescision and damages.

Everett Figgins owns and operates the Big Sky Market in Manhattan, Montana. The Big Sky Market stocks grocery items, but is primarily a meat market. There are facilities on the premises for the complete processing of meats, from live animal to individually wrapped cut. Various cuts of meat are offered for customer choice from refrigerated display cases. In the summer, 1975, Figgins decided to replace his existing display cases. He contacted appellant and asked that they have a representative call on him.

On August 18, 1975, Charles Matthews, a salesman for Transcontinental, met with Figgins, showed him various promotional brochures, and discussed aspects of the available cases. Figgins liked a certain model with wood grain paneled sides, the 3000 unit, and decided to order two of them. A four-page document captioned "LEASE", together with a separate "shipping order", were executed and Figgins gave Matthews a check for $918 as the "rent" payment for the first month and the last five months of the "lease". The "shipping order" specified that Figgins had the option, at no further charge, to obtain title to the display cases at termination of the "lease".

On the next day, August 19, 1975, Matthews informed Figgins that he had called Transcontinental's office to relay the order and had been told that the 3000 model was not available in wood grain. The only model in wood grain was one called an MD. Matthews informed Figgins that the MD model would "do the job" and Figgins consequently agreed to change his order to two MD-8 cases. The line on the "shipping order" specifying two 3000 units was crossed out and an order for two MD-8 units written underneath. The 3000 unit differs significantly from the MD unit in that the 3000 model uses a "gravity coil" system with no air circulation and the MD model has three fans which blow air over the surface of the items stored in the case.

Uncontradicted testimony establishes that·MD-8 models are normally shipped each equipped with their own 1/2 horsepower air compressor to operate the refrigerating coils. Figgins, however, had a new 3/4 horsepower compressor of his own that he wanted to use to operate his two MD-8 units: Matthews informed Figgins that his 34 horsepower compressor might work. Accordingly, the factory installed compressors were eliminated from the shipping order, and Figgins was credited with a discount for the resultant reduction in price.

Two MD-8 units, minus compressors, were shipped to Figgins on or about September 3, 1975. On September 7, 1975, John Dermer of AAA Air Conditioning, Bozeman, Montana, a serviceman with 17 years experience in commercial refrigeration installed the units, hooking them up to Figgins 3/4 horse compressor. When the cases were put into operation, Figgins observed that his meat was dehydrating inordinately fast, drying out, and discoloring. A complaint was made by phone call to Transcontinental. The serviceman who had installed the units spoke to representatives of the manufacturer and made adjustments suggested by them. The problem continued. Letters and phone calls were exchanged, but no representative of Transcontinental ever called on Figgins to examine the cases. The manufacturer sent condensation pans to be filled with water and placed in the unit as a possible remedy.

By a letter dated October 6, 1975, Figgins' attorney informed Transcontinental that the display cases were not suitable for the purpose they had been purchased for, and offered to return the cases in exchange for the down payment. The letter stated that "Mr. Figgins has found it necessary to contact another supplier for a meat case which will arrive in about two weeks". Figgins testified at trial that he had told his attorney he was contemplating ordering new cases but that he never actually did so until around the first of November, 1975.

On October 10, 1975 the condensation pans supplied by the manufacturer as an attempt to cure the defect were installed. The problem still continued. Finally, on November 15, 1975, Figgins

removed Transcontinental's display cases from his market, replaced them with cases ordered from a different company, and placed appellant's cases in storage at a local warehouse. On November 17, 1975, a formal notice of cancellation and rescission was served on Transcontinental.

A complaint was filed in District Court, Gallatin County, by Transcontinental Refrigerator Co. on June 11, 1976. The complaint alleged that Figgins had breached his lease agreement and, pursuant to a clause in the contract providing for payment of "the entire amount of rent . . . due" in the event of breach, demanded the sum of $6,042 plus interest, costs, and attorney fees. Figgins filed an answer on June 23,1976, and an amended answer on July 12, 1976. The answers denied any breach on Figgins' part and alleged fraud and misrepresentation on the part of Transcontinental. By way of counterclaim, Figgins alleged that the display cases were not fit for the purpose for which sold and did not function as represented. The counterclaim prayed for return of Figgins' down payment, for installation and freight costs, and for damages for spoiled meat.

On June 21, 1977, after a period of discovery, trial was held before Judge W. W. Lessley. At trial, Robert Warrington, a Ph.D. professor of mechanical engineering who teaches thermodynamics at Montana State University, was allowed to testify over appellant's objection, as to his opinion on whether the type of display cases supplied to Figgins by Transcontinental were suited to the purpose of preserving the types of meat they were to be used for. Professor Warrington, citing the American Society of Heating, Air Conditioning and Refrigeration Data Guide, which he testified was a standard reference text, stated that while forced air refrigeration was suitable to preserve cured and wrapped delicatessen type meats, the guide book very strongly recommended that circulating air coolers should not be used with fresh meat because evaporation will cause the meat to "scorch or burn".

On July 5, 1977, findings of fact and conclusions of law were entered. The court found that Figgins had relied on Transcontinent-

al's representation in ordering the display cases; that the cases were not fit for the job for which they were ordered because the fans blowing over the cooling coils dried out the meat; that the "lease" was a lease-purchase agreement covered by the Montana Uniform Commercial Code; that a disclaimer of warranties on the lease form was without effect becaue it did not meet the requirements of conspicuousness; and that Figgins was entitled to the relief he requested.

Judgment was entered on July 14, 1977, rescinding the contract and awarding Figgins his $918 down payment, $563.80 in miscellaneous expenses and damages, and $585 in attorney fees. From that judgment Transcontinental brings this appeal.

Appellant raises the following issues for review:

1) Did the trial court err in finding that the agreement between the parties constituted a lease-purchase agreement subject to the provisions of the Montana Uniform Commercial Code?

2) Did the trial court err in finding that the disclaimer of warranties in the agreement was ineffective?

3) Did the trial court err by admitting incompetent expert testimony?

■ The Montana version of the Uniform Commercial Code (U.C.C.) defines "sale" identically to the definition in the national draft:

". . . A 'sale' consists in the passing of title from the seller to the buyer for a price . . ." Section 87A-2-106(1), R.C.M.1947.

Appellant cites the following language from paragraph 19 of the contract to support its position that no "sale" as contemplated by the U.C.C. is involved here: "The equipment, is and shall be and remain, the sole and exclusive personal property of the lessor, and the lessee shall have no right, title or interest therein except as expressly set forth in this lease." Transcontinental argues that this language is conclusive that the agreement was a lease to which the provisions of the U.C.C. are inapplicable. However, as we previously indicated, the shipping order executed simultaneously with the "lease"

agreement gave Figgins the option to obtain title to the equipment at the termination of the lease. Additionally, excerpts from letters sent by Transcontinental to Figgins establish what the true nature of the arrangement was:

Letter of August 21, 1975—"When the balance due including sales tax has been paid, you will receive title in ownership to your equipment."

Letter of September 17, 1975—". . . our long term contract enables (you) to deduct the monthly lease payments as a business expense and own the leased equipment at the expiration of the contract."

"Whether a transaction is characterized as a lease or a sale is not conclusive, but rather it is the intention of the parties which is controlling, that intention to be determined by the facts of each case." *Lease Finance, Inc. v. Burger* (1977), Colo.App., 575 P.2d 857, 859. We agree with the conclusion of the District Court that this was a sale covered by the Uniform Commercial Code rather than a lease exempt from its provisions.

We conclude that the court would have been correct in so holding even in the absence of the supporting inferences raised by the language cited from the letters. Contract documents identical to those involved here were construed in *Mid-Continent Refrigerator Co. v Way* (1974), 263 S.C. 101, 208 S.E.2d 31, to constitute a sale rather than a lease. Mid-Continent Refrigerator is an affiliated corporation of plaintiff, both headquartered in Denver, Colorado. In *Mid-Continent*, a case nearly on all fours with the instant circumstances, the court said:

"When the two contract documents are construed together, resolving as we must all conflicts and ambiguities in favor of the defendant, we conclude that such documents together constitute a contract for the sale of goods and accordingly a contract which is subject to the provisions of the Uniform Commercial Code." *Mid-Continent*, 208 S.E.2d at 34.

The principles articulated in *Mid-Continent* and *Lease Finance, Inc.* are consistent with general rules of law stated in 78 C.J.S. Sales

§ 555, distinguishing conditional sales from other transactions. The District Court properly applied those principles in finding that the Montana Uniform Commercial Code is controlling.

Plaintiff next argues that even if the Uniform Commercial Code does apply, the court's ruling in favor of Figgins was error because the lease-purchase agreement contained a waiver of any warranties of merchantability of fitness for a particular purpose. Paragraph twelve of the contract does indeed contain such a waiver, and it is noteworthy that despite Transcontinental's protestations that the Uniform Commercial Code should not apply to the agreement, the waiver is expressed in the very language required by the Uniform Commercial Code to make such waivers effective. However, the same section of the Uniform Commercial Code which specifies the necessary language also provides that ". . . to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Section 87A-2-316(2), R.C.M.1947. "Conspicuous" is defined in section 87A-201(10), R.C.M.1947:

"A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non-Negotiable Bill of Lading) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court."

The disclaimer of warranties in the contract involved here is in the same typeface as the rest of the contract, and is not indented, underlined, or inked in a contrasting color. It is in no way distinguishable or set apart from the other contract provisions. Under such circumstances, the disclaimer falls far short of complying with the provision of the code requiring conspicuousness. *Mid-Continent*, supra. It is therefore ineffective to protect plaintiff from the consequences of the representations made by its salesman to Figgins that the display cases would do the job of preserving his freshly butchered meats, and The District Court was correct in so holding. "Where the seller at the time of contracting has reason to

know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded . . . an implied warranty that the goods shall be fit for such purpose." Section 87A-2-315, R.C.M.1947.

Concerning the third and final issue for review, the admissibility of expert testimony is controlled by well-settled rules of law. Transcontinental questions the qualifications of the expert who testified in this case, objecting that his status as a mechanical engineer gave him no special expertise on the topic of refrigerated display cases, and further objecting to the use of the reference book by the witness on the grounds that "anybody can pull out a treatise and expound principles". These objections go the weight to be accorded the testimony, and not to its admissibility.

The trial judge, in overruling appellant's objections, said: "I think he would be helpful to the trier of these facts. I now qualify him as an expert to give an opinion if necessary . . . It's helpful to me, and I want to find out about this . . ." We find no error in this ruling. " The determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge, and in the absence of a showing of abuse, ordinarily will not be disturbed." *Haynes v. County of Missoula* (1973), 163 Mont. 270, 290, 517 P.2d 370, 381; 32 C.J.S. Evidence § 458(b). The abuse of discretion must be clearly and plainly shown. 5A C.J.S. Appeal & Error § 1604. No such showing has been made by appellant.

One final matter remains to be discussed before we conclude this opinion. Although not raised as an issue in the original brief, Transcontinental alleges in its reply brief that even if the Uniform Commercial Code applies to this transaction, Figgins lost his right to rescind by failing to give it adequate opportunity to "cure". In support of this argument, appellant cites section 87A-2-508, R.C.M.1947, which provides:

"Cure by seller of improper tender or delivery-replacement.

"(1) Where any tender or delivery by the seller is rejected be-

cause nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

"(2) Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender."

Transcontinental's contention that it was denied the right to cure, and that therefore rescission is unavailable to Figgins, is primarily based on a letter it received from Figgins's attorney. That letter was dated October 6, 1975, before the condensation pans were installed to try to correct the dehydration problem. It indicates that Figgins had at that time already ordered replacement refrigerators. Figgins testified at the trial, however, that he had told the attorney he was contemplating ordering new cases, but that he had not done so until the first of November, and was not aware that the attorney had sent the letter of October 6. It is undisputed that the replacement cases were not installed until November 15, 1975, over a month after the condensation pans were put in as an attempted "cure".

Appellant cites only one case in his reply brief for the proposition that a buyer loses the right to rescind a contract of sale when he refuses to permit the seller to cure a nonconforming delivery. *Wilson v. Scampoli*, (D.C.App.1967), 228 A.2d 848. *Wilson* is distinguishable on its facts. It involves a color television malfunction. The dealer wanted to remove the chasis for a short period of time to determine the cause of the problem, but the buyer refused to allow this. The court in *Wilson* pointed out that no great inconvenience to the buyer was involved, and held that since the seller had been denied access and a reasonable opportunity to repair, there was no breach of warranty.

In the instant case, inconvenience to the buyer was substantial; he lost customers and saw his meat spoil before his eyes every day

the defect continued. No representative of Transcontinental ever inspected the cases to try and solve the problem. The weight of evidence indicates that the problem with the cases was not one that could be cured, but rather was inherent in the air circulation design and its unsuitability to preserve fresh meat. Transcontinental's representatives testifying at trial in this case could not name a single other store in which air circulating coolers were being used to preserve fresh meat. Figgins used the coolers for more than two months, making adjustments and additions suggested by the manufacturer to no avail. A buyer is not required to allow a vendor to tinker with a defective article indefinitely in hope that it may ultimately be made to comply with the warranty. Uniform Laws Annotated, Master Edition Vol. 1, 335, *citing Steele v. J. I. Case Co.* (1966), 197 Kan. 554, 419 P.2d 902.

Transcontinental has also suggested that the reason the display cases did not work properly was because the air compressor used by Figgins to operate them was of inadequate horsepower or was improperly connected. There was conflicting testimony on this matter. On the whole, however, the record establishes that the defect in the display cases was one that could not be cured either by adjustment to the cases themselves or to the air compressor operating them. A cure could only be effected by replacing the air circulating units with a gravity cooled type, and it is nowhere alleged or even hinted that Transcontinental made any offer to substitute.

Affirmed.

MR. JUSTICES DALY, HARRISON, SHEA and SHEEHY concur.