No. 81-259

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

FIRE SUPPLY & SERVICE, INC.,

Plaintiff and Appellant,

-vs-

CHICO HOT SPRINGS,

Defendant and Respondent.

Appeal from: District Court of the Sixth Judicial District,
In and for the County of Park, The Honorable
Jack D. Shanstrom, Judge presiding.

Counsel of Record:

For Appellant:

McKinley Anderson, Bozeman, Montana
Berg, Coil, Stokes & Tollefsen, Bozeman, Montana

For Respondent:

Huppert & Swindlehurst, Livingston, Montana

Submitted on Briefs: August 20, 1981

Decided: February 3, 1982

Filed: FEB 3 - 1982

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

On July 24, 1979, the plaintiff, Fire Supply & Service, Inc., filed an action against the defendant, Chico Hot Springs, in Park County District Court to recover delinquent payments under the terms of a lease the parties had made for the installation and maintenance of a fire alarm system at the Chico Hot Springs resort hotel. Chico Hot Springs counterclaimed for the return of all monies paid under the lease, arguing that Fire Supply had installed a system which failed to meet all expressed and implied warranties. Chico Hot Springs also sought damages resulting from the system's alleged failure to operate as warranted. Trial without jury was held December 15, 1980, and judgment was entered for Chico Hot Springs in the amount of $5,776. Fire Supply appeals.

In 1976, Chico Hot Springs, through its president, Michael Art, approached Fire Supply for the purchase of a fire alarm system for the Chico Hot Springs resort hotel, and relied upon Fire Supply's expertise in recommending an affordable system that would provide reliable protection for the hotel's property and guests. Near the end of November 1976, Fire Supply installed an automatic fire alarm system consisting of several heat detection devices wired to a large and complicated control panel. Fire Supply also installed manual "pull" alarm stations throughout the hotel. On November 26, 1976, the parties signed a "Lease Agreement" which provided that Chico Hot Springs would lease the system for $178.25 per month for a five-year term. Fire Supply was obligated to inspect the system at least once every six months. Upon expiration of the five-year term, Chico Hot

Springs had the option to either renew the lease for another five-year term or to purchase the system for one dollar, in which event Fire Supply's duty to service the system was terminated.

Chico Hot Springs contends that after the lease was executed, the parties agreed that Chico Hot Springs would make payments during the summer months only, and not make payments during the winter months when the resort's business was slow. Fire Supply contends that no such agreement was made, despite the fact that Chico Hot Springs offered into evidence a written modification showing that its lease payments were not to begin until July 1, 1977. In addition, Fire Supply's records show that on November 26, 1976, Chico Hot Springs paid $2,139 for the system's installation, and then did not make any monthly payments until July 1977.

The parties then executed a new lease agreement on July 1, 1977, and rescinded the first agreement. The new agreement was identical to the first one except that the five-year lease term began July 1, 1977. Fire Supply's records show that Chico Hot Springs was $1,248 delinquent in its payments from December 1976 until June 1978, but that this amount was written off Fire Supply's books when the new lease was executed.

Fire Supply's records also show that Chico Hot Springs paid $178.25 per month beginning on July 1, 1977, but missed the November 1977, February 1978, and May 1978 payments. Chico Hot Springs then paid $356 per month during June, July and August, 1978. At the end of August 1978, Chico Hot Springs was current on its account and owed Fire Supply nothing. The records then show that from September 1978 through June 1979, Chico Hot Springs made only five monthly

payments. On July 1, 1979, Chico Hot Springs owed $1,226 to the plaintiff.

On June 24, 1979, Fire Supply sent Chico Hot Springs the following letter:

> "Your account with us for the lease of the alarm system at Chico Hot Springs is now seven months past due. If your check in the amount of $1,587.83 is not received by this office by noon on July 4, 1979, we will repossess the alarm system and this past due account will be turned over for collection."

Upon receiving this letter, Chico Hot Springs' attorney telephoned Fire Supply to request a meeting to discuss the system's performance and the payment schedule. Fire Supply however, refused to either meet with Chico Hot Springs or inspect the system. Chico Hot Springs did not send the requested payment to Fire Supply and refused to allow Fire Supply to repossess the system. The system remained on the hotel premises.

On July 14, 1979, a fire destroyed one of the hotel's guest rooms and endangered the entire hotel. The system did not sound an alarm, either automatically or after an employee pulled the manual alarm. Although the system's control panel had been routinely observed by hotel employees, there was no indication that the system was malfunctioning. It was later determined by Fire Supply that the control panel light which indicates a system malfunction had burned out, but that this would not prevent the alarm from sounding.

Fire Supply obtained a court order to prevent Chico Hot Springs from interfering with the removal of the system, and the system was finally removed from the hotel in November 1979. Fire Supply then filed this action to recover the payments due it under the agreement, contending that Chico Hot Springs breached the agreement by not making the required

-4-

monthly payments. Chico Hot Springs counterclaimed, contending that the system did not work properly after it was installed.

The record reveals that Chico Hot Springs called Fire Supply several times after the system was installed to indicate there were problems with the system. In December 1978, a susbstantial fire had broken out in the resort's snack bar, causing several thousand dollars worth of damage. The fire detection system failed to activate the hotel's alarm, but the fire was discovered by a night watchman. Chico Hot Springs notified Fire Supply of the system's failure, but Fire Supply took no action to identify or correct any problems. Chico Hot Springs also contends that the June 24, 1979 letter it received constituted a breach of the parties' agreement, which entitles it to damages.

The trial court found that Chico Hot Springs relied upon Fire Supply's expertise to furnish a system that would afford reliable protection; that the parties' agreement was actually a sales contract rather than a lease agreement; that Fire Supply had tolerated for three years a schedule whereby Chico Hot Springs made no payments during the winter and then caught up in the summer, and that there appeared to have been a tacit agreement to that payment schedule. The court also found that the system was not the "best" system for the hotel as expressly warranted by Fire Supply and that the system was neither merchantable nor fit for the purpose for which it was intended. The court ordered Fire Supply to return to Chico Hot Springs all monies paid under the agreement ($5,526) and awarded $250 damages for repairs to the fire-damaged guest room.

Fire Supply appeals to this Court to determine whether the trial court's judgment was correct. We affirm that

-5-

judgment, but do not consider the measure of damages because it has not been challenged in this appeal.

The trial court found that "[a]lthough the Contract between the parties is structured in terms of a lease, it provides that at the end of the lease period, the fire alarm system can be purchased for $1.00; accordingly, the true nature of the transaction was a 'sale' and should be so construed." We agree.

A sale is a contract under which title to goods passes from the seller to a buyer for a price. Section 30-2-106(1), MCA. The fact that the agreement was entitled a "lease" rather than an "installment sale contract" does not mean that the parties are not subject to Montana's Commercial Code. In circumstances where the purported "lease" gives the "lessee" the option to acquire the "leased" goods upon expiration of the "lease" term for nominal consideration, the "lease" is commercially indistinguishable from an installment sales contract. Section 30-1-201(37), MCA; Whitworth v. Krueger (1976), 98 Idaho 65, 558 P.2d 1026, 1029.

Chico Hot Springs had the option upon expiration of the "lease" term to purchase the fire alarm system for the nominal consideration of one dollar. This agreement was an executory sale contract in which Fire Supply retained title to the system as a form of security in the event Chico Hot Springs failed to pay as agreed.

The parties' written contract originally provided that Fire Supply would install and periodically inspect and service the fire alarm system for a five-year period beginning November 26, 1976, and that Chico Hot Springs was to pay $178.25 in advance each month during the five-year period.

In the event that Chico Hot Springs defaulted by failing to make punctual monthly payments, the contract provided that Fire Supply had the right to retake immediate possession of the system, without notice to Chico Hot Springs. The contract further provided that upon Fire Supply's repossession of the system, "this agreement shall thenceforth terminate without prejudice to any right or claim for arrears of rent.. . ."

That contract, however, was later rescinded and an identical one was executed, except that the monthly payments were to begin on July 1, 1977, and run for a period of five years from that date. Chico Hot Springs contends that the contract was then further modified by an oral agreement to allow it to make double payments during the summer months and not make some of the winter months' payments. Fire Supply denies that such an agreement was made. The trial court found that Fire Supply tolerated this payment schedule for three years and that there was a tacit agreement supporting that schedule.

Although this contract and any modifications would ordinarily be subject to the statute of frauds because they involve goods with a value greater than $500 (sections 30-2-201(1), -209(3), MCA), there is an applicable exception under section 30-2-209(4), MCA, in which an attempted oral modification can operate as a waiver to assert the statute of frauds defense. In Farmers Elevator Co. of Reserve v. Anderson (1976), 170 Mont. 175, 552 P.2d 63, we held that a defendant's repeated acts of delivery of grain to an elevator after the date originally agreed constituted a modification of the delivery terms, and that although the modification was unenforceable under the statute of frauds, it operated as a waiver to assert that defense.

-7-

Here, Fire Supply installed a fire alarm system in the hotel in November 1976, but Chico Hot Springs made no payments to Fire Supply for eight months. Rather than repossess the system, Fire Supply accommodated Chico Hot Springs by modifying the contract so that the monthly payments would not be due until July 1, 1977. Chico Hot Springs then began making payments each month beginning in July 1977, but missed payments for the winter months of November 1977, February 1978, and May 1978. It then made double monthly payments during June, July and August 1978, but missed payments for September and November 1978, and for February through May 1979. In June 1979 it again made a double payment. An October 2, 1978 letter from Fire Supply to Chico Hot Springs reveals that Fire Supply was willing to tolerate this payment schedule, but would begin charging interest on late payments.

The trial court was correct in finding that this payment schedule, although at variance with the terms of the contract, constituted a course of performance acquiesced in by Fire Supply which modified the contract. We have defined a course of performance as ". . . a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Farmers Elevator Co., supra, 170 Mont. at 181, 552 P.2d at 66. Under section 30-2-208(1), MCA, ". . . any course of performance accepted or acquiesced in without objection . . ." is relevant to determine the meaning of the parties' agreement.

Although the trial court did not specifically find that Fire Supply had waived its statute of frauds defense, the

findings, taken as a whole, imply Fire Supply's acquiescence in Chico Hot Springs' repeated acts of nonpayment during some winter months. It is but a simple matter to conclude that by not taking any action where Chico Hot Springs repeatedly failed to pay during some winter months, Fire Supply has agreed to that arrangement. The parties effectively modified the payment schedule to allow Chico Hot Springs to miss payments during the winter months and catch up with them in the summer.

The trial court also concluded that the fire alarm system failed to meet Fire Supply's express warranty that it was the "best" system for the hotel, and that it failed to meet both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.

To recover damages for a breach of warranty, the buyer must plead and prove that he gave the seller notice of the breach within a reasonable time after it was discovered or be barred from any remedy. Section 30-2-607(3), MCA. The trial court accepted Chico Hot Springs' contention that it advised Fire Supply of the system's failure after the December 1978 fire in the resort's snack bar. In addition, the record reveals that from August 1977 through June 1978, Chico Hot Springs repeatedly notified Fire Supply that the system's alarm, control panel, and heat detectors weren't working as they were supposed to. This was sufficient to inform Fire Supply that the system was troublesome and should have been watched.

Where the seller is aware that the buyer is relying upon the seller's judgment to select suitable goods, an implied warranty that the goods are fit for that particular purpose arises. Section 30-2-315, MCA. The trial court found that Fire Supply was aware that Chico Hot Springs was

-9-

relying on it to recommend and install a fire alarm system which would be suitable for use in the large, old, wood-frame resort. Fire Supply installed a system which was complicated and difficult to use, and which often required Fire Supply to service it. The alarm bells frequently sounded when there was no fire, and did not sound when there were fires. The control panel did not work properly; its "trouble" light continually malfunctioned and then burned out entirely. Fire Supply's own records show that the system was troublesome to operate.

Because we hold that the trial court correctly found that Fire Supply breached the parties' agreement by installing a fire alarm system which failed to meet the implied warranty of fitness for a particular purpose, we need not consider whether any other warranty was breached. Under the breach of warranty, Chico Hot Springs is entitled to recover any loss in value of the goods because of the breach, plus consequential and incidental damages, where proper. Section 30-2-714, MCA. Chico Hot Springs prayed for the return of all monies it had expended under the agreement ($5,526), and the trial court awarded it that amount. Fire Supply has not challenged the validity of that measure of damages.

Because Fire Supply's acquiescence in Chico Hot Springs' payment schedule constituted a modification of the contract, Fire Supply had no right to cancel the agreement for the purported nonpayment. Fire Supply contends that section 30-2-703(f), MCA, gives it the right to cancel the agreement. Reliance on that section, however, is in error; that section deals only with a seller's remedies where a buyer fails to make a payment due at or before the time the goods are delivered to the buyer.

-10-

The trial court's award of consequential damages for the fire damage to the hotel's guest room was also proper under section 30-2-715(2)(b), MCA. The judgment is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices