**WESTMONT TRACTOR CO., Plaintiff,**

v.

**VIKING EXPLORATION, INC., and Charles Einarsen, Defendants.**

**No. CV–81–70–M.**

United States District Court,
D. Montana,
Missoula Division.

July 27, 1982.

Christopher B. Swartley, Missoula, Mont., for plaintiff.

Victor F. Valgenti, Missoula, Mont., for defendants.

## MEMORANDUM OPINION

HATFIELD, District Judge.

The present action arises from an alleged breach of an agreement executed between the parties for the use of two pieces of heavy equipment. Presently before the court are the parties' cross-motions for summary judgment.

Jurisdiction of this action is based on diversity of citizenship. 28 U.S.C. § 1332(a).

## FACTUAL BACKGROUND

Sometime prior to September 16, 1980, employees of the plaintiff, Westmont Tractor Company (hereinafter "Westmont"), and an employee of the defendant, Viking Exploration, Inc. (hereinafter "Viking"), negotiated the sale of two pieces of heavy equipment, *i.e.*, two "wheel loaders". On September 16, 1980, a Westmont form purchase order was prepared, which indicated a sale of the two "wheel loaders" to the defendant Viking. One of the "wheel loaders" was checked out of Westmont's yard on September 16, 1980, the other on September 17, 1980, with each proceeding to certain mining operation locations of Viking.

The terms of the sale were contained on the purchase order, one of which indicated the transaction was a "preferred buy" entitling Viking to a thirty day or two hundred hour warranty period. Also included on the order form was a handwritten provision indicating that the equipment was warranted for a period of thirty days.

On October 9, 1980, a lease agreement, covering the same two pieces of equipment as the aforementioned purchase order, was executed by and between Westmont, as lessor, and Viking as lessee. The lease called for a specific monthly rental fee and included an option to purchase at termination of the lease. Defendant Charles Einarsen, president of Viking, executed the lease agreement on behalf of Viking. On that same date, Charles Einarsen executed a personal guarantee covering the obligation of Viking under the terms of the lease. In addition to executing the formal lease agreement and personal guaranty, Charles Einarsen signed the initial purchase order form of September 16, 1980, on behalf of Viking.

One of the "wheel loaders" subsequently suffered a major breakdown. The parties are in agreement that the breakdown occurred more than thirty (30) days from the date of checkout from the Westmont yard, *i.e.*, September 17, 1980, but less than thirty (30) days after the October 9, 1982 execution of the lease agreement. The crippled "wheel loader" was returned to the Westmont shop, where repairs were made. Having concluded that the thirty-day warranty referred to in the pertinent lease documents had expired as of October 17, 1980, Westmont charged Viking for the repairs. Viking refused to pay for the repairs on the basis that it was Viking's understanding that the warranty ran for a period of thirty (30) days from the October 9, 1980 execution date of the lease agreement. The present action had its genesis in the dispute which arose as a result of the foregoing disagreement.

Westmont ultimately took possession of both "wheel loaders" and proceeded to public sale under the Montana Uniform Commercial Code, specifically §§ 30–2–703, 706 Montana Code Annotated (1979). Westmont initiated the present action under § 30–2–706 M.C.A. (1979) to recover the deficiency between the sale price and the contract price naming as defendants both Viking and Charles Einarsen as guarantor.[1]

In defense, Viking contends that the failure of Westmont to abide by the terms of the thirty-day warranty constituted a breach and rescission of the lease agreement. Viking counterclaims that it is entitled to incidental and consequential damages resulting from the breach and rescission by Westmont.

Westmont counters with the assertion that the ultimate issue to be determined is whether Westmont was justified in finding that Viking had breached the lease agreement. In that respect, Westmont submits that the warranty issue, so vigorously contested by Viking, is irrelevant to the issue of whether Westmont had the right to proceed to public sale and recover the deficiency incurred. *See*, §§ 30–2–703 and 706, M.C.A. (1979). Westmont contends that the failure of Viking to render a downpayment, as allegedly required under the terms of the lease, constituted a breach which entitled Westmont to take possession of the equipment and proceed to public sale.

With respect to the warranty issue, Westmont contends that the warranty period ran from the day the equipment was sent to Viking, *i.e.*, September 16 and 17, 1980, respectively, thereby expiring prior to the date of the major breakdown which prompted this dispute.

## DISCUSSION

### I. *Transaction in Goods?*

■ The proposition advanced by the plaintiff Westmont is premised on the contention that the lease agreement falls within the scope of Article 2 of the Montana Uniform Commercial Code, Title 30, Chapter 2 M.C.A. (1979). As such, Westmont contends, any conduct of Viking constituting a breach of the lease would have entitled Westmont to pursue the remedies available to a "seller" under § 30–2–703 of the Code. Subsection (d) of § 30–2–703 entitles an aggrieved seller to resell the "goods" encompassed by a sales contract and recover damages in the manner provided under § 30–2–706 M.C.A. (1979). § 30–2–706 authorizes the aggrieved seller to resell the contract goods and to measure his damages by the difference between the contract price and the resale price.

The threshold issue which must be addressed in resolving the present dispute is whether the lease agreement at issue falls within the scope of Article 2 of the Uniform Commercial Code. Whereas the title of Article 2 indicates it is applicable to "sales", § 30–2–102 utilizes more permissive terminology in stating that the article applies to "transactions in goods". The question inevitably arises of what "transactions in goods" other than routine sales are included within the scope of Article 2. The foregoing question in relation to leases has provided many courts with the opportunity to expound various fecund theories on the pro-

---

1. The complaint filed herein includes an additional count seeking recovery of one thousand six hundred fifty-six and 76/100 dollars ($1,656.76) from the defendants, allegedly due and owing on an open account maintained by Viking and guaranteed by Charles Einarsen. The court is unable to determine whether that amount represents charges for parts, labor and services rendered with respect to the equipment covered by the contract at issue, or whether that amount represents services, etc., distinct from that contract. Therefore, the court's present ruling is limited to the following issues: (1) whether Westmont is entitled to judgment for the alleged deficiency; (2) whether Viking is entitled to recover on its counterclaim; and (3) whether Westmont is entitled to reasonable rental fee for any period of time during which Viking had possession of the equipment.

The necessity of a trial on the issue of damages with respect to breach of the contract claims is imminent. Trial of the claim pertaining to the delinquent account would be had at that time. Therefore, resolution of the issue whether Westmont is entitled to recover the amounts allegedly due on the account will be made prior to trial.

priety of applying Article 2 to leases.[2] Although this court would certainly express, without trepidation, its viewpoint on that issue, the opportunity to contribute to the quagmire which has developed in this area of the law is not presented to this court whose jurisdiction of the present action is founded on diversity of citizenship. 28 U.S.C. § 1332(a). Rather, this court's review of the pertinent Montana law leads it to conclude that the lease arrangement presented in the case at bar falls within the purview of Article 2 of the Montana Uniform Commercial Code.[3]

## II. *The Contract*

■ Having determined that the transaction at issue was a "transaction in goods" within the meaning of Article 2 of the Montana Uniform Commercial Code, the court must conduct a three step analysis, guided by the pertinent sections of Article 2, in order to dispose of the present motions. First, it must be determined what documents actually constituted the written contract between the parties. Second, a determination must be made whether the contract so discerned was intended as a complete and exclusive written statement of the agreement between the parties. Restated, it must be determined whether the introduction of evidence extrinsic to the written contract is barred by the parol evidence rule. Finally, the court must ascertain what conduct of the parties, if any, constituted a breach of the agreement.

The parties are in agreement that a purchase order form indicating a sale of the two pieces of equipment was prepared on September 16, 1980. The sale terms contained on that purchase order indicated that a "thirty-day warranty" ran to Viking, the "purchaser". The parties further agree that a lease agreement covering the equipment was executed on October 9, 1980. The initial point in dispute is whether the thirty-day warranty contained in the purchase order form was incorporated into the October 9, 1980, Lease Agreement.

The position advanced by Westmont is that the purchase order form represents the contract between the parties, with the execution of the October 9, 1980 Lease Agreement amounting to a ratification of that initial contract. Therefore, Westmont submits that the thirty-day warranty commenced with the delivery of the equipment immediately after execution of the purchase order form on September 16, 1980.

Viking, on the other hand, contends that the October 9, 1980 Lease Agreement represents the final expression of the agreement between the parties. The contract, Viking submits, entails the terms as contained in both the October 9, 1980 Lease Agreement and the September 16, 1980 purchase order form; the terms of the latter document being incorporated into the former.

The document executed on October 9, 1980 was a contract for the lease of the equipment at issue. Neither party contends otherwise. Regardless of the fact that the purchase order form of September 16, 1980 may have been properly characterized as a contract in itself, the execution of the October 9, 1980 Lease Agreement served to modify that September 16, 1980 contract.[4]

---

2. *See*, 4 A.L.R.4th 85 (1981).

3. In *Transcontinental Refrigeration Co. v. Figgins*, 179 Mont. 12, 585 P.2d 1301 (1978), the Montana Supreme Court held that a lease of business equipment, which gave the lessee the option to obtain title to the equipment at termination of the lease, was a "sale" within the meaning of § 87A–2–106(1), R.C.M. 1947, the predecessor of § 30–2–106 M.C.A. (1979). The court fails to perceive any distinction between the lease agreement addressed in *Figgins* and the lease agreement *sub judice*.

4. § 30–2–209 Montana Code Annotated (1979) controls the modification of a contract for the sale of goods. That statute provides:
    (1) An agreement modifying a contract within this chapter needs no consideration to be binding.
    (2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.
    (3) The requirements of the statute of frauds section of this chapter (30-2-201)

Westmont cannot seriously contend otherwise. By its own admissions, Westmont in effect concedes that the initial agreement, which called for an outright sale of the equipment, was transformed into a lease agreement by the October 9, 1980 contract executed between the parties. The October 9, 1980 Lease Agreement, on its face, rejects the contention of Westmont that the agreement was simply a ratification of the prior "sales contract" encompassed by the purchase order form of September 16, 1980.

The determination having been made that the October 9, 1980 Lease Agreement was tantamount to a modification of the contract for sale as encompassed in the purchase order form of September 16, 1980, the issue reduces to whether the terms included in the purchase order form were incorporated into the October 9, 1980 Lease Agreement. The only term of real concern being the thirty-day warranty. It is the conclusion of the court that the thirty-day warranty term was so incorporated.

The court's analysis of the incorporation issue begins with recognition of the fact that resolution of the issue is guided by the prescriptions of the parol evidence rule as codified in § 30–2–202 M.C.A. (1979).[5] The initial inquiry is whether the October 9,

1980 Lease Agreement was intended by the parties as a final expression of their agreement.

The court is convinced that the October 9, 1980 Lease Agreement was intended by both parties as a complete and exclusive statement of all terms of the agreement between the parties. Furthermore, the court concludes that the terms as contained in the purchase order form of September 16, 1980 were incorporated into, and became part of, the October 9, 1980 Lease Agreement. The latter conclusion is based on the fact that the purchase order form was signed by Charles Einarsen, President of Viking, and an agent of Westmont, *i.e.*, Ken Palmerton, substantially contemporaneously with the October 9, 1980 Lease Agreement itself. Both documents were part and parcel of the same transaction.[6]

Taken together as the final written expression of the agreement between the parties, the October 9, 1980 Lease Agreement and the purchase order form of September 16, 1980 are unambiguous on their face, clearly expressing the terms which the parties intended to agree upon. The terms as included therein may not be contradicted by evidence of any prior agreement. § 30–2–202 M.C.A. (1979).[7]

---

must be satisfied if the contract as modified is within its provisions.

    (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

    (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Review of the October 9, 1980 Lease Agreement evinces the fact that the modification of the contract, encompassed by the purchase order form of September 16, 1980, was valid under § 30–2–209 M.C.A. (1979).

**5.** § 30–2–202 M.C.A. (1979) provides:

    Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contra-

dicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

    (a) by course of dealing or usage of trade (30–1–205) or by course of performance (30–2–208); and

    (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

**6.** By Westmont's own admissions, two days of negotiations concerning the lease agreement were conducted between Westmont and Viking on October 8 and 9, 1980, at which time both the formal Lease Agreement and the September 16, 1980 purchase order form were signed by agents of the respective parties. (*See, Deposition of Charles Rummel*, Vice-president of Westmont, pp. 19–25.)

**7.** § 30–2–202 M.C.A. (1979) does provide that the terms of a final written expression may be explained or supplemented:

If Westmont did not intend that the thirty-day warranty be a term of entire agreement between the parties, it was certainly within its power to expressly exclude that term. Having failed to do so, it should not now be heard to complain.

### III. *Breach of the Agreement*

The remaining hurdle in disposing of the cross motions for summary judgment is a determination of which parties' conduct, if any, constituted a breach of the lease agreement.

As noted, Viking contends that Westmont's refusal to honor the thirty-day warranty constituted a rescission of the lease agreement. Westmont, on the other hand, argues that the breach of warranty is irrelevant since Viking's failure to render the "downpayment" expressly set forth in the lease contract constituted a breach, occurring prior to any breach of warranty.

Focusing first on Westmont's contention that the failure of Viking to render "downpayment" constituted a breach of the lease contract, the court finds Westmont's argument in that regard as specious.

The pertinent part of the lease contract with respect to the "downpayment" provides:

Rentals: For said term or any portion thereof, Lessee shall pay Lessor rentals aggregating $179,500.16 of which $3800.00 is herewith paid in advance and the balance of the rental, $175,700.16, is payable in 48 equal, successive, monthly rental payments of $3,660.42 each, of which the first is due November 9, 1980, and the others on a like date of each month thereafter, until fully paid.

The quoted provision called for payment in advance of $3800.00. The parties agree that the advance payment was not rendered by Viking. The advance payment represents a condition precedent to the formation of the lease contract.[8]

A condition precedent is one that is to be performed before an agreement becomes effective, and which calls for the happening of some event on the performance of an act after the terms thereof have been agreed upon, before the contract shall be binding on the parties. *Atlantic-Pacific Oil Co. of Mont. v. Gas Development Co.*, 105 Mont. 1, 69 P.2d 750 (1937). It is evident that Westmont's reliance upon the failure of Viking to render the advance payment as the basis of this suit is misplaced. If Westmont's argument is carried to its logical conclusion, the inevitable result would be that the lease agreement never became effective and hence was not binding on either party.

The only logical interpretation which can be afforded the events which transpired is that Westmont waived the advance payment requirement by delivering the equipment prior to receipt of that payment.[9] The effect of a waiver of an execu-

(a) by course of dealing or usage of trade (§ 30 1 205) or by course of performance (§ 30 2 208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Evidence falling within the two exceptions of § 30 2 202 may be introduced even if the language of the agreement is unambiguous on its face. It is evident, however, that the term at issue, *i.e.*, the thirty-day warranty, would not give rise to evidence falling within the purview of either exception.

8. § 28 1 403 M.C.A. (1979) provides:
A condition precedent is one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed.

9. The deposition of Charles Rummel, Vice-president of Westmont, states at pp. 27–29:
Q. (Attorney for Viking) Now, this equipment lease reflected by Deposition Exhibit 2 provides for a payment of three thousand, eight hundred dollars in advance and then rentals at three thousand, six hundred and sixty dollars and forty-two cents commencing November 9th, 1980. To the best of your knowledge, was the downpayment ever paid?
A. (Mr. Rummel) No.
Q. Now, do you know whether that amount was billed to Mr. Einarsen at some time after the October 9th signing date of this equipment lease?
A. Yeah, I think we've got it here.

tory portion of a contract within the scope of Article 2 of the Montana Uniform Commercial Code is controlled by § 30–2–209(5) M.C.A. (1979).[10] § 30–2–209(5) provides, however, that the waiver could have been retracted by reasonable notification to Viking. Westmont has not alleged that it intended to retract the waiver, let alone that Viking was notified of any intent to retract. To the contrary, the deposition of Westmont's Vice-President acknowledges that such advance payments under a contract of the type at issue would normally be placed on open account. Having waived the requirement of advance payment and further failing to make any retraction of that waiver, Westmont cannot rely on the failure of Viking to render that payment as basis for a breach of contract action under § 30–2–706 M.C.A. (1979).

■ The determination that the thirty-day warranty at issue was incorporated into the October 9, 1980 Lease Agreement taken in conjunction with Westmont's admissions that (1) the equipment breakdown occurred prior to the expiration of the thirty-day period; and (2) Westmont refused to absorb the cost of repairs, establishes that Westmont's failure to abide by the terms of the warranty constituted the first breach of the lease contract.

The foregoing analyses establishes that the plaintiff, Westmont, was the party actually in breach of the lease contract. Westmont's contention that it is entitled to judgment, under § 30–2–706 M.C.A. (1979), in an amount equal to the deficiency realized after public sale must be rejected.

With respect to the counterclaim of Viking seeking damages incurred as a result of Westmont's breach and rescission of the lease contract, the extent of damages which Viking may recover is controlled by § 30–2–715 M.C.A. (1979).[11] The extent of the

Q. Now, have you found some documentation which can enable you to answer that question, Mr. Rummel?
A. Yeah, yeah, we did bill it.
Q. And when would that bill have gone out? Can you tell me that?
A. There's a stripe over here, but I would say it appears to be 10/13 of '80.
Q. 10/13 of 80?
A. You can look at it and see what you think. Either 10/10 or 10/13.
Q. Or 10/18.
A. Yeah, it's one of those three dates.
Q. Now, from this, then, I would assume that it would not be unusual to, in a transaction of this nature, not receive the thirty-eight hundred dollars immediately at the time of the signing of the agreement and go ahead and bill it out to the customer; is that correct?
A. Well, in certain situations, that is correct. Maybe that was one of our downfalls or whatever, but if you were going strictly according to the book, the initial payment would have been made before the equipment left the yard. That's the standard rule of thumb, the way the attorneys say, to do business. Sometimes we do business a little bit on a gentleman's agreement and sometimes, I guess, that isn't the way to do business, but by rights, the thirty-eight hundred dollars should have been collected prior to the machine's going out, although we were led to believe all along, you know, that Viking Exploration was getting together financial statements and other documents for CIT because the whole transaction was supposed to be going through CIT and we were waiting on this information to come out of Denver. The people appeared to be dealing in good faith with us. They needed the machines immediately and we elected to go ahead and put those machines out prior to having all the documentation done.

10. § 30–2–209(5) M.C.A. (1979) provides:
A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

11. § 30–2–715 M.C.A. (1979) provides:
(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
(2) Consequential damages resulting from the seller's breach include:
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(b) injury to person or property proximately resulting from any breach of warranty.

damages to which Viking may be entitled presents a factual question to be determined at the time of trial.

### IV. *Reasonable Rental*

Rejection of Westmont's claim for a deficiency judgment, for the reasons stated, necessitates an inquiry into whether Westmont would be entitled to a reasonable rental fee for the period of time within which the equipment was in the possession of Viking. A review of the pertinent Montana law reveals that Westmont is entitled to recover, in *quantum meruit*, a reasonable rental fee for the use of the equipment by Viking. *See, Baldwin v. Stuber*, 182 Mont. 501, 610 P.2d 160 (1979). The rationale expressed in *Baldwin* establishes that recovery in *quantum meruit* is appropriate in an action brought on an express or special contract where there exists an unusual and equitable reason for such recovery and the particular situation seems to justify it. Such a situation is clearly presented in the present case. Furthermore, under Rule 8(e)(2) of the Federal Rules of Civil Procedure, recovery can be had on *quantum meruit* where only an express contract is pleaded, without the necessity of amending the pleadings to conform to the proof. *See, Matarese v. Moore-McCormack Lines, Inc.*, 158 F.2d 631 (2nd Cir. 1946).

The record in this matter convinces this court that Westmont has established the right to recover in *quantum meruit* a reasonable rental fee for the use of the equipment by Viking. The extent of that recovery shall be determined at the trial of this matter.

For the reasons set forth above, IT IS HEREBY ORDERED:

1. That plaintiff's motion for summary judgment on the issue of liability is DENIED.

2. That defendants' motion for summary judgment on the issue of liability is GRANTED.

3. That the parties appear before this court for trial of this matter on August 16, 1982, at 9:30, in *Billings*.