No. 82-331

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

ROBERT R. DIEDE,

      Plaintiff and Respondent,

  -vs-

BILLY J. DAVIS,

      Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, The Honorable
Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Holmstrom & Dunaway; William J. O'Connor II,
        Billings, Montana

    For Respondent:

        Davidson, Veeder, Baugh, Broeder, Poppler
        and Michelotti; Doris Poppler, Billings, Montana

---

Submitted on Briefs: December 30, 1982

Decided: March 24, 1983

Filed: **MAR 24 1983**

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant (lessee) appeals from an award of $8,400.00 in damages to plaintiff (lessor) in this action arising from lessee's breach of a lease agreement. The case was tried before the Thirteenth Judicial District Court, Yellowstone County, sitting without a jury. We affirm in part, reverse in part and remand to the District Court for further proceedings consistent with this opinion.

Lessee raises the following issues for review:

1. Whether the District Court erred in finding that there was no oral agreement between the parties which terminated the lease.

2. Whether the District Court erred in failing to find that lessor was estopped from asserting any damages under the lease, or had waived his right to assert them.

3. Whether the District Court erred in fixing the rights of the parties at the time of the sale of the truck without taking into consideration the subsequent lease.

Lessor is in the business of leasing trucks in Yellowstone County, Montana; lessee is in the trucking business in the Billings area. On October 30, 1980, the parties entered into a written agreement for the lease of a 1979 Freightliner truck-tractor, for 46 months beginning November 15, 1980. Lessee agreed to pay a rental of $1,500.00 per month for the first 24 months, and a rental of $950.00 per month for the remaining 22 months. The lease included the typed-in statement, "Lease is non-cancellable." It also provided that lessee would pay for all maintenance and necessary repairs and insurance, and that he would reimburse lessor for any taxes lessor paid on the truck. The lease further provided that the agreement was only a rental

agreement, and lessor, who was the owner of the truck, would retain title unless the vehicle was purchased by lessee. The lease contained a statement of what constituted default, and the following provision:

> "REMEDIES: In the event of default by Lessee, Lessor may terminate the lease and, at its option, 1. Treat the equipment as its own in full settlement of Lessee's obligations under the lease; or
> 2. By notice to Lessee, sell the equipment at public or private sale, in which event, Lessee shall be liable to Lessor for the difference between (a) the sum of all rentals called for by the lease plus the residual value, less (b) the sum of all rent paid and net proceeds of the sale."

On October 30, 1980, the parties also signed an option-to-purchase agreement providing that, at the expiration of the lease term, lessee would have the option to purchase the leased vehicle for $7,500.00, if his payments were up to date, and he was not otherwise in default. The truck's mileage was 102,000 miles when lessee obtained the vehicle. Lessor listed its retail value as $47,500.00 on the lease agreement.

Lessee made the lease payments through December, 1980, but, because lessee had to pay for major repairs to the truck's engine that month, the parties agreed that the January payment would be deferred. Timely lease payments were made until June of 1981, and a $500 payment was made in May, toward the $1,500.00 payment deferred in January.

In the middle of June, lessee learned that a truck of his which had been stolen had been recovered and would be returned to him. On June 13, he deleted lessor's truck from his insurance and added his own recovered truck. Lessee was at the time recuperating from heart surgery and had been informed that a second operation might be required. He contacted lessor and informed him that because of his illness, he wished to return the 1979 Freightliner to lessor.

3

According to lessee, lessor agreed during a telephone conversation on June 15, 1980, to accept the truck back if all payments were brought up to date. Lessee testified that on June 20, he brought the check and the truck's keys to lessor's home, and the parties orally agreed that the lease was terminated and no further obligation existed on the part of either lessee or lessor. Lessor denied that any such agreement existed; he testified that no June 15 telephone conversation had occurred. He argued that, because it was lessee's obligation to maintain the truck, his acceptance of the vehicle's return was dependent upon its condition.

Because lessor lived in a residential neighborhood, lessee did not return the truck to lessor's home address, but parked it in the "West Parkway", for lessor to pick up later. When lessor tried to start up the truck two days later on June 22, it would not start. Lessee paid several hundred dollars for repairs, but refused to pay for further repairs because he believed the lease had been terminated as of June 20.

On July 23, 1980, lessor informed lessee by certified letter that, because the truck was in no condition to re-lease, and because lessee had defaulted by failing to keep the vehicle insured between June 13 and June 20, 1980, lessor intended to proceed under the Remedies portion of the lease, and offer the truck for public sale. Lessee did not respond to the letter. Lessor subsequently ran the following advertisement for ten days in the Billings Gazette:

> "Public Sale: '79 Freightliner COE, serial #168606. Location: Warehouse, corner 23rd & 4th Ave. So., Billings. Date of sale: August 8, 1981, 10 a.m. Owner reserves right to bid."

Four prospective buyers besides lessor were present at the sale on August 8, 1981. One of them, Don Adams, opened

4

the bid at $36,000.00. No one else bid except lessor, who "bought the truck back" for $36,500.00.

On September 2, 1981, after making certain repairs on the truck, lessor re-leased it to Don Adams, for 48 months at $1,250.00 per month, with the option to purchase at the end of the lease period for $7,125.00. The truck was again valued at $47,500.00.

On August 19, 1981, lessor filed a complaint in the District Court, alleging breach of contract and seeking damages in the amount of $15,900.00. Trial was held on March 12, 1982, and judgment was entered on May 11, 1982. The District Court denied lessor recovery of residual value of $7,500.00, but awarded damages of $8,400.00, the difference between the sale price of the truck and the remaining payments on lessee's contract.

Lessor argues that this Court should apply the provisions of the Uniform Commercial Code (UCC) in resolving this dispute. Lessee maintains that the October 30, 1980 lease agreement was neither a sale nor a security agreement, and the UCC does not apply. We agree.

As lessee points out, lessor is in the business of leasing vehicles; the lease agreement explicitly states that it "is a rental agreement only"; the option to buy is a separate agreement; and the record is barren of evidence that any acknowledged security agreement existed or was filed. Section 30-9-203(1),(b), MCA.

The characterization of the transaction as a lease or a sale is not conclusive; it is the intention of the parties which is controlling, that intention to be determined by the facts of each case. Transcontinental Refrigeration Co. v. Figgins (1978) 179 Mont. 12, 18, 585 P.2d 1301, 1305. In Fire Supply & Service v. Chico Hot Springs (1982) ____ Mont.

5

_____, 639 P.2d 1160, 39 St.Rep. 231, we upheld the District Court's determination that a sale was actually intended, and the UCC applied, where, at the expiration of the "lease" term, a fire alarm system could be purchased for $1.00, stating:

> "A sale is a contract under which title to goods passes from the seller to a buyer for a price. Section 30-2-106(1), MCA. The fact that the agreement was entitled a 'lease' rather than an 'installment sale contract' does not mean that the parties are not subject to Montana's Commercial Code. In circumstances where the purported 'lease' gives the 'lessee' the option to acquire the 'leased' goods upon expiration of the 'lease' term for nominal consideration, the 'lease' is commercially indistinguishable from an installment sales contract. Section 30-1-201(37), MCA; Whitworth v. Krueger (1976), 98 Idaho 65, 558 P.2d 1026, 1029." _____ Mont. at _____, 639 P.2d at 1163, 39 St.Rep. at 234.

In Transcontinental Refrigeration Co. v. Figgins, supra, several documents indicated that the "lessee" had the option to obtain title to the property at no further charge at termination of the "lease"; such an agreement was recognized as a sale.

In the case at bar, lessee would have had to pay lessor $7,500.00 to obtain title to the truck, upon expiration of the lease period. That is not "nominal consideration" for a heavily-used truck which was not new at the beginning of the lease period. The facts of this case indicate that a lease, and not a sale or security agreement, was intended by the parties, and accordingly, the UCC does not apply.

Lessee argues that a fully executed oral contract to terminate the lease was effected on June 20, 1981, when lessor accepted the truck keys and payment of all money due on the lease. He points out that under section 28-2-1602, MCA, a written contract may be altered by an executed oral agreement, and under section 28-2-104, MCA, a fully executed contract is one the object of which is fully performed.

6

We have no quarrel with lessee's statement of the law. But the trial court found as a matter of fact that "the Lessor denied any such oral agreement and the facts do negate the existence of any meeting of the minds on the point."

The function of this Court in reviewing a challenge to the sufficiency of the evidence is well-settled:

> "We will not substitute our judgment for that of the trier of fact, but rather will only consider whether substantial credible evidence supports the findings and conclusions. Those findings will not be overturned by this Court unless there is a clear preponderance of evidence against them. We will view the evidence in a light most favorable to the prevailing party, recognizing that substantial evidence may be weak or conflicting with other evidence, yet still support the findings."

Spraggins v. Elvidge (1982) ____ Mont. ____, 647 P.2d 859, 861, 39 St.Rep. 1229, 1232, citing Cameron v. Cameron (1978) 179 Mont. 219, 228, 587 P.2d 939, 945.

Here, lessor testified that, on June 20, 1981, lessee simply came to his house with the check and the truck keys; he testified that there was no prior telephone conversation and no oral agreement to terminate the lease. He also testified that, three days later, upon learning that the truck required numerous repairs and lessee denied responsibility for further repairs, he told lessee, "Bill, we've got two problems: Number one, you're not going to pay me any more money, and number two, I'm not taking the truck back in this condition." Lessor's position is that, Remedy No. 1 under the lease was dependent upon lessee's having kept the truck in good condition, viz., that lessor could not be expected to agree, and in fact did not agree to the return of the truck in satisfaction of all lessee's obligations, without first ascertaining that the vehicle was in good condition.

We find there is substantial evidence to support the District Court's conclusion that there was no meeting of the minds on June 20, 1981, and hence no oral agreement to terminate the lease.

Lessee next argues that the District Court should have found that lessor was estopped to assert damages, or had waived his right to assert them. Lessee maintains that lessor led him to relinquish his possessory interest in the truck by making oral representations that the lease was terminated. He claims that:

> "[Lessor] accepted the truck back, asking at the time only that he be paid in full to date and that the work necessary on the truck be paid for by [lessee]."

The District Court found that lessee had "brought all lease payments current and surrendered the keys to the truck to Lessor at his home, intending that such action would amount to a termination of the lease." Obviously the District Court did not find substantial evidence that lessor was aware, or should have been aware of lessee's belief that the lease would be terminated that evening, nor do we find a preponderance of evidence to the contrary. Indeed lessor's behavior, upon discovering that the truck required repairs, is far more consistent with lessor's position, that the lease was not to be terminated until he had had an opportunity to ascertain that the truck had been properly maintained by lessee, as required under the terms of the lease. Lessee's claim that lessor waived his right to assert damages is merely another way of saying that the parties had reached some form of agreement to terminate the lease without further obligation to either.

Equitable estoppel is an unfavored doctrine and will only be sustained upon clear and convincing evidence. Boise

8

Cascade v. First Security Bank of Anaconda (1979) 183 Mont. 378, 393, 600 P.2d 173, 182. We do not find such evidence to support lessee's argument.

Lessee maintains that the District Court erred in fixing the rights of the parties at the time of the sale of the truck, without considering the subsequent re-lease of the truck.

Lessee argues first that the remedy of sale provided in the lease is void as a liquidated damage; presumably lessee means that if the remedy is void, the sale cannot be interposed between lessee's breach and lessor's subsequent re-lease of the vehicle, to establish greater damages than could be established by comparing the effects of the breach with the second lease. Lessee argues that the remedy is void under section 28-2-721, MCA, which provides that:

> "(1) Every contract by which the amount of damage to be paid or other compensation to be made for a breach of an obligation is determined in anticipation thereof is to that extent void, except as expressly provided in subsection (2).

> "(2) The parties to a contract may agree therein upon an amount which shall be presumed to be an amount of damage sustained by a breach thereof when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

Lessee also relies upon this Court's decision in Morgen & Oswood Construction v. Big Sky of Montana (1976) 171 Mont. 268, 557 P.2d 1017. Lessee's reliance is misplaced in both instances. Both Morgen &. Oswood Construction and section 28-2-721, MCA, refer to contracts which establish the amount of damage or compensation to which the aggrieved party is entitled in the event of a breach of contract. There was no such provision in the lease agreement considered herein. The Remedies section of the lease merely established an optional procedure by which lessor could determine the extent of

9

damages; there was no stipulated amount of damages to be presumed. We find the law on liquidated damages inapplicable here.

The District Court concluded that lessor "properly mitigated damages through compliance with the remedies provided in the lease and his actions following completion of such remedies are not available to [lessee] as further mitigation."

Lessee argues that the District Court erred in failing to consider the re-lease of the truck in fixing the rights of the parties, because this allowed lessor a "windfall" at lessee's expense, and permitted lessor to recover an amount greater than his damages. Lessee submitted the following comparison in support of his argument that, if the value of the Adams lease is considered in mitigation only insofar as it overlaps the original (Davis) lease, it is still more valuable to lessor than the original lease:

|  | Diede-Davis Lease | Diede-Adams Lease |
|---|---|---|
| Terms | Nov. 1980-Sept. 1984 | Sept. 1981-Sept. 1985 |
| Payments | 24 mo @ $1500 per mo<br>22 mo @ $ 950 per mo | 48 mo @ $1250 per mo |
| Total Lease | $56,900 | $60,000 |
| Monies paid through June, 1981 | $12,000 | -------- |
| Total under lease from July, 1981 to Sept. 1984 | $44,900<br>(Damages) | $45,000<br>(Mitigation) |

The duty of the injured person to reduce or mitigate damages is a positive duty, within limits; the test is: "What would an ordinary, prudent person be expected to do under the circumstances?" Harrington v. Holiday Rambler Corp. (1978) 176 Mont. 37, 42, 575 P.2d 578, 581, citing

10

Spackman v. Ralph M. Parsons Co. (1966) 147 Mont. 500, 505, 414 P.2d 918, 921.

Here, lessor possessed full title to the truck both before and after the sale; neither property nor consideration changed hands in the transaction. There was no payment from buyer to seller to offset damages resulting from lessee's default, thus no mitigating effect in plaintiff's purchase of the truck. Such a sale does not constitute the attempt to mitigate damages that could be expected of an "ordinary, prudent person." Lessor then re-leased the truck to Don Adams for slightly more than he would have received from lessee over the same period. Lessor now attempts to interpose the sale of the truck between lessee's breach and the re-lease so that the sale, not the re-lease, is treated as meeting the obligation to mitigate damages caused by the breach. Under these circumstances, we conclude that the primary purpose of the sale was to set up a technical basis for claiming damages against lessee, when in fact, no loss or damage was suffered. This would permit a lessor to "buy back" the leased article for far less than its value, then hold defaulting lessee responsible for the difference between the remaining value of the lease and the sale price of the property, while simultaneously benefiting from continued ownership of the property. This would defeat the purpose of the rule establishing an obligation to mitigate damages, and would unfairly allow lessor recovery greater than the amount he would have received had lessee fully performed the contract. Sections 28-3-301, 28-3-311, MCA. We hold, therefore, that the value of the re-lease, rather than the sale price of the truck, must be considered in determining mitigation of damages.

11

We note that lessor paid for certain repairs and replacement of parts on the truck when re-leasing the vehicle to Don Adams (plaintiff's exhibit no. 6). Under the terms of the original agreement, lessee (Davis) was responsible for maintenance and "any necessary repairs" to the vehicle. The record does not establish which, if any, of the repairs made in August and September of 1981 were "necessary", and which of those necessary repairs were incurred before Adams became responsible for maintenance and repairs, and could therefore be considered damages. We therefore remand this case for such further proceedings as are necessary to establish the amount for repairs paid by lessor and chargeable to lessee, and for entry of judgment based upon lessor's damages, if any, which are in excess of the $45,000 mitigation value of the second lease.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices